# UNITED STATES COURT OF APPEALS FOR VETERANS CLAIMS

No. 24-3304

ALEXANDER A. MEDLIN, APPELLANT,

V.

DOUGLAS A. COLLINS,
SECRETARY OF VETERANS AFFAIRS, APPELLEE.

On Appeal from the Board of Veterans' Appeals

(Decided April 6, 2026)

*Glenn R. Bergmann* and *David S. Ames*, of Rockville, Maryland, were on the brief for the appellant.

*Michael R. Hogan,* Acting Principal Deputy General Counsel; *Mary Ann Flynn*, Chief Counsel; *Melissa A. Timbers*, Deputy Chief Counsel; and *Spencer S. Horseman*, all of Washington, D.C., were on the brief for the appellee.

Before BARTLEY, TOTH, and FALVEY, *Judges*.

TOTH, *Judge*, filed the opinion of the Court. BARTLEY, *Judge*, filed a dissenting opinion.

TOTH, *Judge*: From time to time it becomes necessary for courts to revisit their most frequently cited caselaw to ensure that governing standards haven't drifted from their original meaning due to overfamiliarity and so risk becoming boilerplate. This reconsideration motion, which the Court grants, provides occasion to look closely at how the Court assesses whether the Board satisfied its duty to provide adequate reasons and bases for its decision.

Contending that the Court overlooked his argument and engaged in improper factfinding, Air Force veteran Alexander A. Medlin moved for reconsideration of a memorandum decision that affirmed a March 2024 Board decision denying his claim for a psychiatric disorder. Mr. Medlin's claim for benefits was premised on his contention that his decline in performance during service constituted the requisite in-service event, or alternately, served as evidence of a psychiatric disability incurred during service. On appeal, Mr. Medlin argued that the Board provided insufficient reasons and bases to support its decision because it mischaracterized his performance

evaluations and so downplayed evidence relevant to the in-service injury or event element. The Court affirmed, discerning that the Board provided adequate reasons to support its finding.

We granted reconsideration to discuss in greater detail the nature of the Board's duties to provide reasons and bases for its decisions under 38 U.S.C. § 7104. The Court thus withdraws its August 2025 memorandum decision and issues this decision in its place. In so doing, we hold that the Board provided findings and explanations as to all material issues of fact and law; it analyzed and discussed the credibility and relative probative value of the material evidence; it explained which items of evidence it regarded as more persuasive than others; and, it provided reasons for rejecting the appellant's reading of potentially favorable evidence in the form of the military personnel records. Because there is no basis to conclude that the Board failed to satisfy its duty to provide adequate reasons and bases, and no clear factual errors for us to correct, the Court affirms.

## I. BACKGROUND

Mr. Medlin served in the Air Force from 1985 until 1993 when he was discharged for failing to meet the Air Force's weight standards. R. at 1977. His theory of service connection for his psychiatric disorders is based on his weight gain during service: specifically, he asserts that his in-service weight gain reflects an event (for the purposes of establishing service connection) because it was either evidence of declining performance standards or of his emerging psychiatric conditions.

Mr. Medlin's weight problems began about 6 years after enlistment. In July 1991, he was placed in a weight management program to help him lower his body fat percentage to meet the Air Force's weight standards. From 1991 to 1993, he failed his weight management programs, as reflected in official reprimands for failure to maintain weight standards and annual performance evaluations. *See, e.g.*, R. at 1897 (August 1992 reprimand), 1935 (November 1992 performance evaluation).

Despite his difficulty maintaining weight standards, he excelled in work performance and was promoted shortly before his discharge. Across several categories of his performance evaluations, he was lauded as being highly skilled, exceeding standards and expectations, and setting examples for others. *See, e.g.*, R. at 1936. His lowest marks were in categories such as on- and off-duty conduct, knowledge about primary duties, and compliance with Air Force standards—presumably due to his weight issues. Nonetheless, his overall marks were good: for

2

knowledge of primary duties, he was noted as having "[e]xtensive knowledge of all primary duties and all related positions"; for on- and off-duty conduct, he set "the example for others"; and for compliance with standards, he was found to meet Air Force standards. R. at 1935. But because Mr. Medlin struggled to maintain his weight to meet Air Force standards, he was recommended for an honorable discharge in 1993. *See* R. at 1903.

The record before the Court does not reveal much for the period between Mr. Medlin's discharge and the early 2000s, when he began seeking mental health treatment. One of the first medical records in the file is a primary care note from May 2005, where Mr. Medlin "den[ied] any history [of] depression, anxiety or related disorders." R. at 2459. In June 2007, he "reluctantly" met with a social worker. R. at 2440. He appeared to seek treatment because "his primary care provider and his live-in girlfriend expressed concern with his moodiness." R. at 2440. At the appointment, Mr. Medlin denied experiencing depression symptoms but "admit[ted] to anxiety." R. at 2440. He primarily reported issues with irritability and anger "for years," in addition to many experiences with anxiety. In terms of his military history, the social worker noted that he referred to his service experience "with fond terms." R. at 2442. The social worker's assessment was generalized anxiety disorder; the pair agreed that he would try individual psychotherapy. R. at 2443.

Shortly after, in January 2008, Mr. Medlin had a consultation with a VA psychiatrist, Dr. Komareth. R. at 2227. After an in-depth interview, Dr. Komareth observed that the veteran had "some depression, a severe temper and anger management problems and alcohol abuse history." R. at 2227. Dr. Komareth prescribed a treatment plan that included medication and supportive therapy.

In June 2010, Mr. Medlin was evaluated in preparation for a deployment to Afghanistan as an employee of Defense Finance and Accounting Service. His treating physician noted that he "has had some problems with chronic depression and anxiety for approximately 2 to 3 years" and that his symptoms are "well controlled" with medication and personal therapy. R. at 2212.

Then, in June 2016, Mr. Medlin filed a claim for a psychiatric disorder. In September, he filed another claim for bipolar disorder and depression. In the ensuing decision, VA denied service connection for bipolar disorder and other psychiatric conditions. Mr. Medlin quickly filed a Notice of Disagreement (NOD). He included a letter from his treating psychiatrist, Dr. Komareth, who said that he had been treating Mr. Medlin since 2008. Dr. Komareth explained that the veteran had

3

a long history of psychiatric symptoms and that he probably has had a psychiatric condition for many years. He added that Mr. Medlin reported he had mental health symptoms while in the Air Force. R. at 1128. The Agency continued to deny the claim, and Mr. Medlin continued to appeal. As part of his appeal to the Board, he submitted another letter from Dr. Komareth, which reiterated that "it is highly probable that he had [bipolar disorder] for many years even while he was in the Air Force before I saw him." R. at 441. At his Board hearing, Mr. Medlin reported that his psychiatric symptoms began in service and that his decline in performance evidenced his emerging symptoms. R. at 210-13. He testified that towards the end of his service he was having a hard time concentrating (R. at 210), "screwing up" at work (R. at 212), and having marital problems that led to divorce (R. at 212-13). He also said that, shortly after his discharge, he tried to get a job as a corrections officer but was denied for failing the psychological testing. R. at 210.

The Board denied his claim, and he appealed to the Court with help from the same law firm that represents him in this appeal. In a memorandum decision, the Court remanded for the Board to address whether the duty to assist required it to obtain a VA nexus opinion, an error that the Secretary had conceded. On remand, the Board found that VA had no duty to provide an exam. It issued several findings (discussed further below) to support that determination, including rejecting the veteran's theories that his in-service weight gain reflects an in-service event because it was either evidence of declining performance standards or evidence of his emerging psychiatric conditions.

On appeal, Mr. Medlin argues that the Board did not provide an adequate statement of reasons and bases for its determinations that (1) his service records do not show a decline in performance, (2) his reports of in-service psychiatric symptoms are not credible, and (3) the September 2016 letter from Mr. Medlin's treating psychiatrist is not probative. *See* Appellant's Br. at 6. He attacks these findings in an effort to overturn the Board's ultimate determination that he did not have an in-service event or symptoms that would trigger a need for VA to provide a medical exam. *See* 38 C.F.R. § 3.159(c) (2025). He also argues that the Board clearly erred in failing to remand to obtain private records under the duty to assist.

4

## II. ANALYSIS

### A.

In the seminal decision of *Gilbert v. Derwinski*, 1 Vet.App. 49 (1990), we noted that 38 U.S.C. § 7104 establishes a discrete duty upon the Board to explain its various findings and does not displace 38 U.S.C. § 7261, which sets out the standards of review by which the Court assesses error in a Board decision.[1] Examining both statutory provisions, *Gilbert* held in unequivocal terms that the Court assesses for clear error the discrete findings and supporting analysis of the Board. "[I]n order for a finding of material fact made by [the Board] to be set aside, this Court must conclude that the finding is 'clearly erroneous.'" *Id*. at 52. Significantly, the act of assessing discrete findings of the Board for error constituted a similar but nonetheless distinct task from assessing whether the Board rendered all necessary findings as to material facts and issues and whether its explanation supporting such findings was adequate for purposes of judicial review. As to the duty to provide reasons and bases, *Gilbert* noted that to "facilitate judicial review," the Board must "articulate with reasonable clarity its 'reasons or bases' for decisions," including identifying "those findings it deems crucial to its decision," accounting for "evidence it finds persuasive or unpersuasive" through "clear analysis." *Id*. at 57.

Although this formulation has been refined over the years, *Gilbert*'s basic framework remains controlling. A survey of three decades of caselaw assessing the Board's duty under section 7104 reveals several basic principles that inform how the Court reviews whether the Board satisfied its duty under section 7104. We restate these principles here. *First*, as overall background, section 7104 establishes a duty for the Board and does not purport to set out a superordinate standard of review for this Court that displaces the "clear error," "arbitrary and capricious," or "abuse of discretion" standards set out in section 7261 by which the Court assesses agency error in a particular finding. *Id*. at 52. Instead, evaluating whether the Board satisfied its duty to provide reasons and bases entails a discrete inquiry with a specific methodology assessing identifiable factors that have been set out clearly across scores of cases from this Court.

*Second*, the touchstone in assessing whether the Board satisfied its reasons and bases duty is whether the decision is intelligible and so is "adequate to enable a claimant to understand the

---

[1] At the time *Gilbert* was issued, the reasons and bases duty was codified at 38 U.S.C. § 4004, whereas the Court's scope of review was codified at 38 U.S.C. § 4061. Those provisions are currently codified at 38 U.S.C. §§ 7104 and 7261, respectively, and are identical in all material respect to the versions interpreted in *Gilbert*.

precise basis for the Board's decision and to facilitate review in this Court." *Southall-Norman v. McDonald*, 28 Vet.App. 346, 355 (2016). This naturally focuses on whether the Board has rendered all the necessary findings on material issues of fact and law and whether its analysis of such findings is intelligible to the claimant and Court alike. *Id.; Gilbert*, 1 Vet.App. at 57. If the Court needs to guess what the Board's reasoning might be as to a material issue of fact or law, the Board has violated its duty to provide adequate reasons and bases.

*Third*, and most relevant here, the duty to provide reasons and bases extends to material issues of law and fact "upon which the outcome of the litigation depends." *Gilbert*, 1 Vet.App. at 52. By covering only material facts, the reasons and bases duty does not require the Board to discuss every peripheral fact or detail in a record whose ultimate relevance to dispositive findings is unclear. *See Newhouse v. Nicholson*, 497 F.3d 1298, 1302 (Fed. Cir. 2007). Because they influence dispositive rulings, material facts are "crucial" to a decision such that in their absence a reviewing court would have to supply a vital link in the reasoning for a finding. *Gilbert,* 1 Vet.App. at 57. As to material issues of fact and law, the Board "must identify those findings it deems crucial to its decision and account for the evidence which it finds to be persuasive or unpersuasive." *Id*. For issues of law, the Board must address all regulations that are "made potentially applicable through the assertions and issues raised in the record." *Thomas v. McDonough*, 97 F.4th 850, 853 (Fed. Cir. 2024) (citing *Schafrath v. Derwinski*, 1 Vet. App. 589, 593 (1991)).

*Finally,* when reviewing matters under section 7104, the Court assesses the Board's decision "as a whole," rather than isolating a single aspect or sentence of the Board decision. *Janssen v. Principi*, 15 Vet.App. 370, 379 (2001). As *Gilbert* noted, material issues of fact and law are those that affect the outcome of litigation. Because the duty does not extend to non-material issues, a misstatement or other error cannot be deemed to invalidate the Board's reasons and bases unless it can be shown to adversely affect or render unclear the Board's reasoning with respect to a dispositive ruling. *Valiao v. Principi*, 17 Vet.App. 229, 232 (2002). In other words, the misstatement must affect the outcome of the litigation. *Gilbert*, 1 Vet.App. at 52 (explaining that material facts are those on which "the outcome of the litigation depends"). Because the reasons and bases duty applies only to material factors, a misstatement relating to non-material factors does not constitute a violation.

Combining all these discrete duties, a Board decision satisfies the reasons and bases duty when, read as a whole, it renders findings on all material issues of fact and law and provides

6

sufficient analysis for the claimant and the Court to understand the rationale supporting such findings. This requires the Board to sufficiently analyze the credibility and probative value of evidence, account for evidence that it finds persuasive or unpersuasive, and provide reasons for rejecting any material evidence favorable to the claimant. *Arline v. McDonough*, 34 Vet.App. 238, 247 (2021).

Here, the appellant's reconsideration motion challenged the Court's review of the Board's reasons or bases duty on the grounds that the review constituted improper "factfinding." Because these two issues—the Board's duty to provide reasons and bases and the Court's obligation to review the Board decision against the evidence of record—are so closely bound, we address this as well.

The term "factfinding" has been used overbroadly in veterans law to such a degree that it risks becoming wholly untethered from how that term is understood elsewhere in law. As a term of art, factfinding means entering specific findings as to *dispositive elements* of a legal claim according to the evidence of record.[2] This is no different in veterans law or administrative law in general. Reflecting this common understanding, we issued our decision in *Gilbert* that mandates that the Board enter factual findings as to all material issues "'upon which [the] outcome of the litigation depends'." 1 Vet.App. at 52 (alteration in original) (quoting *Black's Law Dictionary,* 881 (5th ed. 1979)).

Factfinding, in other words, always relates to material facts: this Court has never held that judicial review is not allowed unless the Board provides a line-item accounting of every detail in a record. Indeed, the common law principle spelled out in *Chenery v. SEC*, 332 U.S. 194, 196 (1947), that a reviewing court cannot uphold a policy determination on grounds different than those provided by the agency, has never been read to suggest that judicial review is limited to only those details expressly cited by the administrative agency. *See Sanders v. Shinseki*, 556 U.S. 396, 406 (2009) (holding that the Court assesses the prejudicial effect of error by making a case specific assessment in the same manner as federal district courts under 28 U.S.C. § 2111). And for good

---

[2] In criminal law, the Sixth Amendment secures, among other things, the right of a criminal defendant to have a jury determine all the statutory elements of an offense as well as any fact that raises the statutory minimum or maximum sentence. *See Alleyne v. United States*, 570 U.S. 99 (2013); *Apprendi v. New Jersey*, 530 U.S. 466 (2000). Civil law offers an ever narrower account of factfinding, where the Seventh Amendment has been interpreted as requiring no more from a jury than to resolve genuine issues of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317 (1986). The Seventh Amendment has never been read to prohibit judges from reading the evidence of record and granting summary judgment or dismissing pleadings that fail to state a plausible claim for relief. *Id*.; *Bell Atl. v. Twombly*, 550 U.S. 544, 570 (2007).

reason: in addition to making judicial review impossible, it would redirect the Board's focus from discussing the most probative evidence and salient issues to addressing every peripheral item of evidence or face automatic remand. This, in turn, would place incredible strain on Board adjudicators and extend the intolerably long wait for Board decisions.

Instead, our caselaw is clear that once the Board has entered findings as to all matters controlling the outcome of litigation, the Court reviews such findings for clear error in the same way that all federal courts of appeal review the findings of trial courts. Here again is *Gilbert* on that point: "While the Supreme Court's discussion of 'clearly erroneous' was within the context of one judicial tribunal reviewing another judicial tribunal, the *same principles* govern our situation." *Gilbert*, 1 Vet.App. at 52 (emphasis added) (citing Supreme Court cases). Further, insofar as they are called to assess error, reviewing courts are not only allowed but *required* to review and discuss the evidence of record and match it against the dispositive findings and rationale offered by the Board to see if they bear a plausible basis in the record. Hyper-formalist notions, where a reviewing court is prohibited from discussing any evidence not expressly discussed by the Board (or is limited to repeating the same terminology as the lower tribunal) are not compatible with how federal courts conduct judicial review. *See Golden v. Collins*, 161 F.4th 1346, 1352 (Fed. Cir. 2025).

At the appellate level, improper factfinding occurs in two ways. *First*, it transpires when an appellate court considers matters outside the appellate record, such as conducting independent factual research. *See, e.g.*, *Rogozinski v. Derwinski*, 1 Vet.App. 19, 20 (1990) (holding that review in this Court shall be on the record of proceedings before the Secretary and Board).[3] *Second*, improper factfinding happens when an appellate court subjects the findings of a lower tribunal to de novo review rather than affording the appropriate deference mandated by the governing standard of review. Here again we turn to *Gilbert*, as it describes what improper factfinding looks like for this Court: "It is *not* the function of this Court to decide whether a veteran was injured or whether any such injury occurred in or was aggravated during military service; rather, it is the function of this Court to decide whether such factual determinations made by [the Board] in a particular case constituted clear error." *Gilbert*, 1 Vet.App. at 53*; see also Tadlock v. McDonough*,

---

[3] Reflecting on the centuries of legal thought, St. Thomas Aquinas cited to the longstanding prohibition on judges considering extra-record evidence. The judge, Aquinas observed, must only arrive at the truth within the boundaries of the process duly set out by the legislator, without using his private knowledge or relying on information unduly obtained. Summa Theologica II-II, Q. 67. Art. 2.

5 F.4th 1327, 1338 (Fed. Cir. 2021) (explaining that this Court erred when it made the initial finding on a claim element that the Board never reached or addressed).

Notably, both notions—the prohibitions on extra-record evidence and de novo review of existing findings—track perfectly the scope of review that Congress set out for this Court in 38 U.S.C. § 7261. First, section 7261(b) limits our review to the "record of proceedings before the Secretary and the Board of Veterans Appeals." Second, regarding the appropriate deference by the Court, section 7261(c) establishes that "[i]n no event shall findings of fact made by the Secretary or the Board of Veterans' Appeals be subject to trial de novo by the Court." In sum, improper judicial factfinding turns on whether we (1) considered matters outside the appellate record or (2) subjected existing findings of the Board to de novo review rather than under the "clearly erroneous" standard. *See Icicle Seafoods, Inc. v. Worthington*, 475 U.S. 709, 714 (1986) ("If [the Court of Appeals] was of the view that the findings of the District Court were 'clearly erroneous' within the meaning of Rule 52(a), it could have set them aside on that basis . . . . But it should not simply have made the factual findings on its own.").

### B.

Turning to this case: Mr. Medlin challenges the Board's explanation for three of its findings: (1) that his service records do not show a decline in performance, (2) that his reports of in-service psychiatric symptoms are not credible, and (3) that the September 2016 letter from Mr. Medlin's treating psychiatrist is not probative. Appellant's Br. at 6-7.

*Decline in performance*. Mr. Medlin raises three arguments relevant to this finding, contending that either his declining performance or his weight gain in service is the "event" that shows his emerging psychiatric conditions for service-connection purposes. This is relevant because the Board may have obtained a VA exam to evaluate a nexus if it found a decline in his performance.

First, he challenges the Board's discussion of his performance evaluations "dated in November 1991 and November 1992" that cover his performance from "September 1990 to . . . November 1992." R. at 10. The Board observed that the veteran had been promoted during that period and presumed that the promotion was based on good job performance. R. at 10. In his new position, the veteran "continued to receive the highest marks in all categories concerning knowledge of primary duties based on technical expertise and compliance with military standards based on factors that included weight and fitness." R. at 10. It was significant to the Board that,

9

despite the veteran failing to meet weight standards, his performance did not decline. Per the Board, the lack of evidence showing an overall decline in performance supported the conclusion that the veteran's testimony that he had a decline in performance in service was not credible and that his service records do not show an indication of mental health symptoms during service. R. at 9. Mr. Medlin calls this finding inaccurate, arguing that the November 1992 performance review shows that he did not have the highest marks in "conduct." R. at 1935. Indeed, in the "conduct" category, Mr. Medlin was marked four out of five, which means that he "[s]et the example for others." R. at 1935.

This record evidence, however, does not contradict the Board's finding or render it implausible. The appellant's argument is premised on the notion that the Board made a definitive finding that, during the pertinent service period, he scored the highest marks in all categories except two. But the Board's finding was more general than this and centered upon the overall quality of Mr. Medlin's performance in service, notwithstanding any deficiencies relating to weight issues. To that end, the Board observed that, during the period in question (until November 1992), Mr. Medlin was promoted to a new position, and his overall performance did not decline. That the Board elected to focus on overall performance and so discussed the broader picture presented by the evaluations rather than rendering discrete findings corresponding to minute, line-items within the evaluations does not call into question its analysis that, considered as a whole, the evidence of record failed to show a decline in performance. This is a plausible reading of the evidence, even if it can be argued that it's possible to read the same evidence of record differently.

Mr. Medlin next argues that the "Board concluded, essentially, that physical fitness itself is not part of military performance standards" when it said that his decline in military weight standards "'does not reflect a decline in his work performance.'" Appellant's Br. at 12 (quoting R. at 11). The Court takes issue with the premise of this argument, as there is no indication that the Board surmised that weight and fitness standards were wholly unrelated to overall performance standards. It noted that "the fact that [Mr. Medlin] was found in the last two performance evaluations only to meet military standards rather than to set the example or exemplify them does not reflect a decline in his work performance." R. at 11. The Board drew a distinction between weight standards and work performance, explaining that, although the veteran was falling behind in weight standards, his work performance and relationships with others were above par. R. at 14 ("[T]he service personnel records show he consistently received high marks for the quality of his

10

work throughout his service, and indeed had recently been promoted toward the end of his service."). Contrary to the appellant's view, the Board never found that weight standards do not comprise an aspect of performance standards.

Alternately, the appellant contends that, even if the Board did not err in its findings about performance, Mr. Medlin's in-service weight gain itself "may be evidence of the beginning of psychiatric symptoms during service." Appellant's Br. at 14. Indeed, Mr. Medlin argued below that his "in-service weight issue is an in-service event for purposes of service connection." R. at 28. But the Board disposed of this argument by finding no evidence of psychiatric symptoms during service. *See* R. at 18. Because the Board discussed the veteran's weight gain in depth, the Board considered and rejected the notion that the in-service weight gain was a psychiatric symptom.

In his brief to the Court, Mr. Medlin provided additional support for this argument, explaining that his in-service weight gain can be viewed as a symptom of bipolar disorder and, thus, could represent the early stages of bipolar disorder. Importantly, he says "the evidence shows that Mr. Medlin experienced clinically significant weight gain during service," which indicates the onset of his bipolar disorder. Appellant's Br. at 17. But "the evidence" that the veteran points to was simply not before the Board. *See* Appellant's Br. at 17 (citing MERCK MANUAL 1767 (20th ed. 2018)). The Court has the authority to "take judicial notice of facts of universal notoriety that are not subject to reasonable dispute." *Monzingo v. Shinseki*, 26 Vet.App. 95, 103 (2012).

The facts of *Monzingo* are instructive. There, the Court took judicial notice of the fact that a particular medical article was published and that VA had knowledge of that medical article. But it added that the findings and conclusions within that published medical article "are neither facts of universal notoriety nor facts not subject to reasonable dispute." *Id*. at 104. Thus, the Court did not take judicial notice of the article's findings and conclusions and did "not evaluate the Board's decision through the lens of those findings and conclusions." *Id*. And because those reports were also "not raised by Mr. Monzingo below or reasonably raised by the record," the Court found no Board error in not addressing them. *Id*. We reach a similar result here.

The Court is known to rely on the *Merck Manual* or other medical reference books for information on facts of universal notoriety, mostly to define certain diseases or conditions. But here, Mr. Medlin relies on the *Merck Manual* for findings and conclusions that are subject to reasonable debate. For instance, the *Merck Manual* suggests, but does not definitively conclude, that the presence of a mental health condition might be accompanied by weight gain *or loss.* The

11

qualifying nature of this language renders the pertinent findings and conclusions subject to reasonable debate, especially as those findings and conclusions apply to a particular case. Thus, in this case, the Court will not take judicial notice of the *Merck Manual*'s findings and conclusions on this topic and will therefore not evaluate the Board's decision through the lens of those findings and conclusions. *See id.*

After removing the *Merck Manual* from consideration, the overall argument falls flat. In essence, the appellant asserts that the Board did not adequately address his theory that his weight gain in service was evidence of a psychiatric condition, either because the weight gain was a symptom of the psychiatric condition or because it was evidence of the onset of a psychiatric condition. But the Board did address this theory when it concluded that the veteran did not have symptoms of a psychiatric condition in service.

*Credibility.* Mr. Medlin asserts two reasons why the Board's credibility assessment is erroneous. "When assessing the credibility of lay evidence, the Board may consider factors such as facial plausibility, bias, self-interest, and consistency with other evidence of record." *Southall-Norman*, 28 Vet.App. at 355. Indeed, the "'Board, as a fact finder, is obligated to, and fully justified in, determining whether lay evidence is credible'" in light of "'conflicting statements'." *Gardin v. Shinseki*, 613 F.3d 1374, 1379 (Fed. Cir. 2010) (*quoting Buchanan v. Nicholson*, 451 F.3d 1331, 1337 (Fed. Cir. 2006)). This assessment is a "quintessential factual determination[]" reviewed "under the clearly erroneous standard." *Kays v. Snyder*, 846 F.3d 1208, 1212 (Fed. Cir. 2017).

He first argues that the Board used its findings about a lack of decline in performance to discredit his credibility and, since (as argued above) that finding is inadequate, its credibility finding is further unsupported. Since the Court sees no error in the finding about the absence of a decline in performance, this argument also fails.

Second, he takes issue with the Board's reliance on a 2007 treatment record noting that he recalled his time in the military "with fond terms." R. at 14. He argues that the Board "manufactured a determination as to the likely emotions Mr. Medlin would have felt while experiencing psychiatric symptomatology." Appellant's Br. at 18. The Court disagrees; it seems the appellant has again taken a particular sentence of the Board's decision out of context to allege error. Yes, the Board noted that Mr. Medlin recalled his military service fondly in 2007. But that same paragraph draws a broader picture as to why the Board did not believe Mr. Medlin's reports that his psychiatric symptoms began in service. The Board noted that Mr. Medlin denied

12

psychiatric symptoms in February 1993 and May 2005; that, in 2010, he told a treatment provider that the onset of psychiatric symptoms occurred only a few years earlier; that, in 2008, he reported that he was discharged for weight gain and did not mention having psychiatric symptoms during service. Taken altogether, the Board did not rely on Mr. Medlin's reports (that were made in connection with his claim) that his symptoms began during service. This paragraph reflects that the Board considered and weighed a totality of the evidence, just as it is supposed to do. Thus, contrary to the appellant's contentions otherwise, the Board correctly considered the totality of the evidence in reaching its determination, and its statement of reasons or bases is adequate. *See Madden v. Gober*, 125 F.3d 1477, 1481 (Fed. Cir. 1997) (noting that it is the "duty [of] the Board to analyze the credibility and probative value of evidence"). It did that here and made a permissible credibility determination.

*Dr. Komareth's Opinions*. Mr. Medlin last challenges the Board's finding that Dr. Komareth's 2016 and 2018 opinions were unreliable. A VA medical report is adequate when it is based on the veteran's relevant medical history and describes the medical issues in sufficient detail so that the Board's evaluation of the claimed disabilities will be fully informed. *Sharp v. Shulkin*, 29 Vet.App. 26, 31 (2017). VA examiners do not have a reasons-or-bases requirement and so do not have to "explicitly lay out [their] journey from the facts to a conclusion." *Monzingo*, 26 Vet.App. at 106. That said, they do have to provide a "reasoned medical explanation" connecting their conclusions to the supporting data. *Nieves-Rodriguez v. Peake*, 22 Vet.App. 295, 301 (2008). A determination that a VA medical report is adequate is factual in nature and is accordingly reviewed by this Court for clear error. *Id*.

The Board found Dr. Komareth's opinions unreliable because he wrote them "in response to his request for such a letter in support of a claim for service connection, and thus . . . had an incentive to misrepresent his medical history for purposes of substantiating the claim." R. at 15. Mr. Medlin argues that the Board failed to address the fact that Dr. Komareth treated him since 2008 and, thus, Dr. Komareth did not offer an opinion "based exclusively on statements made contemporaneous with the claim for benefits." Appellant's Br. at 19. Again, the appellant's argument misconstrues the Board's findings. The Board acknowledged that the letter came from the veteran's "treating psychiatrist" but discredited the opinion because it was obtained in pursuit of a claim for benefits and premised on the veteran's statements, which were deemed not credible. R. at 17-18. Because the appellant misreads the Board's findings, his assertions of error fail.

13

In sum, the Board spent three full pages discussing its reasoning as to why it found that the evidence, when viewed as a whole, did not support a finding that Mr. Medlin's performance declined in service. Indeed, it's virtually impossible to read the 1,200 or so words of analysis the Board spells out and claim that it's insufficient to allow the claimant to understand the precise basis of the Board's decision. It analyzed the probative value of dozens of discrete pieces of evidence, from Mr. Medlin's 1993 separation exam to various treatment records spanning 20 years, to his performance evaluations, to his statements at hearing describing his condition. It discussed why it found the February 1993 separation exam and May 2005 VA treatment record where he denied a history of depression, anxiety, and other related disorders more probative than other records and his later statements attesting to in-service manifestations of that disability. R. at 14. It found probative a June 2010 VA treatment record where he reported experiencing depression and anxiety for "the past two to three years at the time." *Id*. Further, the Board explained why it rejected Mr. Medlin's later statements regarding in-service depression and anxiety as less probative than his earlier statements that described his service in "fond terms," and it noted that his leaving service due to weight management issues was probative towards its conclusion that no in-service disability manifested. *Id*. As such, it rendered a requisite credibility determination: that Mr. Medlin's accounts failed to square with the balance of the evidence, which failed to show a discernible decline in performance in service sufficient to satisfy the requisite in-service element.

Considering this extensive analysis, it is implausible to read the Board's decision and claim that it failed to (1) sufficiently analyze the credibility and probative value of evidence; (2) account for evidence that it finds persuasive or unpersuasive; or (3) provide reasons for rejecting any material evidence favorable to the claimant. *Southall-Norman*, 28 Vet.App at 355. Whatever minor discrepancy exists in its discussion of Mr. Medlin's performance evaluations does little to cast doubt on the Board's broader conclusion that his performance evaluations from November 1992 didn't show a marked decline in performance. The Board's analysis of Mr. Medlin's performance in service spans several pages and is more than sufficient to enable him to understand the precise basis for the decision and to allow review by this Court. Whether a different trier of fact may have viewed the same evidence and arrived at different conclusions than the Board is irrelevant when assessing whether the Board satisfied its reasons and bases duty. Under section 7104(d), the Board entered all the requisite findings on all *elements* and *material* issues and so satisfied its duty.

14

C.

This point—that the Board said all that we need to review its decision—also serves as a good point to respond to our dissenting colleague's concerns. We agree with her that our decision should not be read as altering our reasons or bases review. We cannot do that. Nor do we need to; the reasons or basis requirement is well settled: the Board violates it when it fails to sufficiently explain its decision and so frustrates our review. When it comes to facts, that review is for clear error. *Gilbert*, 1 Vet.App. at 52. In the cases our colleague cites, VA's failure to make required findings or address issues raised in the record frustrated our review. Here there is no such failure.

Indeed, all our reasons or bases decisions rest on the intelligibility of the agency decision; after all, the obligation to provide understandable reasons or bases is not a unique feature of veterans law. By the time Congress gave the Board such a requirement, it was a well established feature of administrative law. *Gilbert*, 1 Vet.App. at 56 (*citing Sec. & Exch. Comm'n v. Chenery Corp.*, 332 U.S. 194, 201 (1947)). Congress created the reasons or bases requirement for most agencies when it enacted the Administrative Procedure Act (APA) in 1946, and that requirement remains there to this day. *See* 60 Stat. 237; *see also* 5 U.S.C § 557(C).

Decades before this Court was created, the Supreme Court clarified that the reasons or bases requirement did not oblige agencies to make findings about every detail in the record or discuss every matter in a case; the focus was on only those issues material to the agency's decision. *See Minneapolis & St. L. Ry. Co. v. United States*, 361 U.S. 173, 193 (1959). And under this requirement, the Supreme Court has instructed reviewing courts that, absent clear error in the actual findings, they must "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974). Thus, courts have understood this to mean that, "[a]lthough findings are required when an agency performs its adjudicatory function, reversing an agency order for failure to abide by this command is inappropriate when the path followed by the agency can be discerned and when its statement is sufficiently precise to permit meaningful judicial review." *Wasson v. S.E.C.*, 558 F.2d 879, 884 (8th Cir. 1977)*; see also Aero Mayflower Transit Co. v. I.C.C.*, 711 F.2d 224, 232 (D.C. Cir. 1983) (explaining that "Courts often have refused to strike down an agency ruling for allegedly inadequate supportive explanation when reasonably able to discern the path of the agency's reasoning" and collecting cases).

15

We know from the Supreme Court that our scope of review is "similar to that of an Article III court reviewing agency action under the Administrative Procedure Act, 5 U.S.C. § 706." *Henderson v. Shinseki*, 562 U.S. 428, 432 n.2 (2011). And Congress gave the Board the same reasons or bases obligation as other agencies. 38 U.S.C. § 7104(d)(1). From the beginning we have understood that reasons or bases obligation to be rooted in the same principles of administrative law. *See Gilbert*, 1 Vet.App. at 56. And it is hard to understand where this Court would get the authority to take the same statutory language and create greater obligations to thrust on a cabinet level agency; "we struggle to see on what basis a court could impose such a procedure on VA." *Bilharz v. Collins*, 38 Vet.App. 366, 379 (2025).

At bottom, the reasons or basis requirement centers on the ability to understand the Board decision. *Gilbert*, 1 Vet.App. at 57. But as in all areas of administrative law, "[t]his duty of explanation is not intended to be a mandate for administrative verbosity or pedantry. If a reviewing court can discern 'what the [V]LJ did and why he [or she] did it,' the duty of explanation is satisfied." *Piney Mountain Coal Co. v. Mays*, 176 F.3d 753, 762, n 10 (4th Cir. 1999) (*quoting Lane Hollow Coal Co. v. Dir., Off. of Workers' Comp. Programs*, 137 F.3d 799, 803 (4th Cir. 1998).

As our dissenting colleague points out, there have been many circumstances in which we found that the Board fell short of providing an adequate explanation, but this is not such a case. The Board provided a detailed explanation for why it found that Mr. Medlin's performance had not declined in service, and the Board did not clearly err; its determination is plausible even with the record that Mr. Medlin now focusses on. Thus, Mr. Medlin's "contention that the agencies failed to consider certain evidence is a quibble with how the agencies weighed the evidence." *Smith v. Garland*, 103 F.4th 1244, 1253 (7th Cir. 2024), *cert. denied*, 145 S. Ct. 1059 (2025). When, as here, we can review the Board's factual finding for clear error, the Board's failure to provide a specific discussion of some piece of the evidence does not frustrate our review; in other cases, such a failure might be fatal to our understanding. *See, e.g., post* at 19*,* (collecting cases)*.*

### D.

Finally, in our original memorandum decision, we also declined, on grounds of issue exhaustion, to entertain an allegation that the Board failed to satisfy its duty to assist. The appellant has not challenged this ruling in his reconsideration motion and so the Court merely restates its earlier ruling, albeit with compressed analysis.

16

Here, Mr. Medlin was represented by the same counsel in the previous Court appeal in 2022. The appellant did not make a duty-to-assist argument at that time, despite the necessary information that he believes raised the issue being present in the record since 2016. R. at 1602. When the Court remanded the claim in 2022, the Board was instructed to consider the appellant's remaining arguments; the previous briefing on the issues was included in the record to aid the Board. And although counsel did not continue to represent the veteran before the Board,[4] neither The American Legion (the representative on remand) nor counsel submitted a new argument on the Board's duty to help the veteran obtain private records. Thus, regardless of the break in representation between the veteran's first and second Court appeals, current counsel had multiple opportunities to assist the veteran in raising this issue before the Board and this Court. Waiting until now to raise this argument demonstrates the type of piecemeal litigation tactics and gamesmanship that the doctrine of issue exhaustion seeks to prevent.[5]

"When presented with a new issue on appeal, the Veterans Court can exercise sound discretion to reject the newly raised argument under the doctrine of issue exhaustion." *Stinson v. McDonough*, 92 F.4th 1355, 1363 (Fed. Cir. 2024) (citing *Maggitt v. West*, 202 F.3d 1370, 1377-78 (Fed. Cir. 2000)). In exercising this discretion, the Court must determine "'whether the interests of the individual weigh heavily against the institutional interests' in 'protect[ing] agency administrative authority' and 'promot[ing] judicial efficiency.'" *Morris v. McDonough*, 40 F.4th 1359, 1362 (Fed. Cir. 2022) (quoting *Maggitt*, 202 F.3d at 1377) (alterations in original). Invoking issue exhaustion is appropriate particularly where the issues are procedural, *Scott*, 789 F.3d at 1381, and where the veteran is represented by the same counsel at the Court as before the Board, *Massie*, 25 Vet.App. at 127-28. Thus, to preserve judicial efficiency and protect administrative

---

[4] It does appear that counsel faxed their briefing to VA on behalf of Mr. Medlin but did not raise other arguments. R. at 36-71.

[5] The Court notes that the veteran's argument on this point contends that the record reasonably raised the issue of the missing private treatment records. *See Robinson v. Peake*, 21 Vet.App. 545, 552-53 (2008), *aff'd sub nom. Robinson v. Shinseki*, 557 F.3d 1355 (Fed. Cir. 2009). This Court has acknowledged that there exists a tension between the Court's discretion to decline to hear arguments first raised on appeal and the Board's duty to address issues reasonably raised by the record. *Massie v. Shinseki*, 25 Vet.App. 123, 130 (2011). But we nevertheless exercise that discretion here given that Mr. Medlin only argued to VA about missing VA records and, in his motion for reconsideration, he admits that it was only "[d]uring the course of this Court appeal, [that] Mr. Medlin realized the significance of the missing evidence." Motion for Reconsideration at 5. If Mr. Medlin's counsel didn't know he had relevant private treatment records, we don't understand how the Board could have.

17

authority, the Court exercises its discretion not to entertain this argument under the doctrine of issue exhaustion. *See Morris*, 40 F.4th at 1362; *Maggitt*, 202 F.3d at 1377.[6]

### III. CONCLUSION

Accordingly, the Board's March 12, 2024, decision is AFFIRMED.

BARTLEY, *Judge*, dissenting: I strongly oppose the majority's attempt to dilute this Court's review of Board factfinding and reasons or bases compliance, which would, if successful, result in decisions that abdicate our appellate authority rather than analyze and rigorously review VA's compliance with the law. Fortunately, although the majority decision is precedential, it is powerless to overturn prior precedent concerning factfinding and reasons or bases compliance, and it cannot restrict our review of Board reasons or bases. Ultimately, the majority cannot use this case as a vehicle to curtail future Court review of Board decisions. As to Mr. Medlin's case specifically, because the majority here weighs a material fact in the first instance and ignores or justifies the Board's mischaracterization of the veteran's November 1992 annual performance report, all of which requires remand, I dissent.

In beginning its analysis, the majority references a handful of well-known veterans law cases that focus on some core aspects of how the Court assesses whether the Board has met its statutory reasons or bases responsibility. Unless the majority's summary is an attempt to proscribe further growth in this area of law or prevent practitioners from using the entirety of precedent reasons or bases caselaw to assess compliance, I have no problem with it – as far as it goes. But a summary is just that, a summary. Omitted are many core principles concerning assessment of Board reasons or bases. For example, there is no reference whatsoever to extensive caselaw addressing assessment of reasons or bases as to medical evidence, a key factor in vast numbers of

---

[6] Our discretion is not driven by this, but we note that it is difficult to understand how the purported duty to assist error could have been prejudicial. In his motion for reconsideration, Mr. Medlin invites us to review new records that he obtained to prove prejudicial error. Even assuming that these records are fair game for our error review (a premise we accept only for argument's sake, *see* 38 U.S.C. § 7252(b)), the Board denied his claim because of no in-service event or injury. Mr. Medlin doesn't explain or suggest how the records he submitted now, or the records he thinks are otherwise missing from the record, would help prove an in-service injury. In his briefing Mr. Medlin highlights treatment around the year 2000. The records he obtained and wants us to consider concern treatment in 1999. Mr. Medlin left service in 1993. No matter how we look at it, we don't see how treatment more than half a decade after leaving service would impact the Board's conclusion that Mr. Medlin did not have an in-service injury or event. The Board's finding remains plausible. And we can't understand how any perceived error harmed Mr. Medlin. *See Slaughter v. McDonough*, 29 F.4th 1351, 1355 (Fed. Cir. 2022).

18

cases. To pluck just two cases of many, in *Gabrielson* the Court held that the reasons or bases function is similar to cross-examination in adversarial litigation, requiring the Board to critically examine unfavorable medical evidence. *Gabrielson v. Brown*, 7 Vet.App. 36, 40 (1994). And in *Savage,* the Court determined that the Board may not reject unclear or insufficient private medical evidence without first either asking the expert for clarification or adequately explaining why clarification isn't necessary to decide the claim consistent with the duty to assist. *Savage v. Shinseki*, 24 Vet.App. 124, 135 (2010). These decisions, and tens of others, may provide more useful and targeted guidance concerning what is required for the Board to accomplish its statutory reasons or bases duty.

The majority goes on to assert, without support, that the term "factfinding" is used overbroadly in veterans law—because, the majority claims, in referring to factfinding we focus on facts that are not material or not dispositive. *Ante* at 7.[7] I completely agree that the Court should not waste its time on facts that are not material to the case. But, in fact, the majority presents no evidence that the Court routinely does so. Material facts are not limited to those directly dispositive of entitlement to service connection (or other claimed VA benefit). For example, one of the issues in this case is whether Mr. Medlin's performance declined in service—whether or not it declined is a *material* fact because the answer to that question is necessary to determine whether the veteran is entitled to an examination and linkage opinion that could, in turn, result in facts directly *dispositive* as to service connection. To suggest that evidence triggering VA's obligation to further develop a claim isn't material to a claim because such evidence isn't dispositive until that development occurs upends the entire veteran-friendly, paternalistic system. And the majority certainly cannot want to achieve such a result, nor can it do so by means of a three-judge panel opinion.

After faulting the Court's use of the term factfinding, the majority proceeds to identify two circumstances of inappropriate judicial factfinding: where the Court considers extra-record

---

[7] In discussing this Court's purported overly broad use of factfinding, the majority seems to conflate "material" and "dispositive." *Ante* at 7. Facts may be material to the ultimate determination without being directly dispositive as to that determination. Dispositive facts are those that are "decisive of a legal matter," while material facts include those that "make[] a difference in the result to be reached in a given case." BLACK'S LAW DICTIONARY (12th ed. 2024).

evidence or conducts de novo review of the Board's factual findings. *Ante* at 8-9. I don't disagree that those are examples of improper judicial factfinding, but the majority limits its scope to those two circumstances and omits one that matters in Mr. Medlin's case: the Court reviewing and weighing facts in the first instance. The Federal Circuit has been clear that this Court "exceed[s] its statutory authority when it improperly weigh[s] evidence in the first instance." *Stinson v. McDonough*, 92 F.4th 1355, 1362 (Fed. Cir. 2024). As discussed below, the majority ignores this controlling principle in Mr. Medlin's case.

Moving to the specifics of Mr. Medlin's case, in his briefs and motion for reconsideration the veteran argued, among other things, that the Board failed to acknowledge that his November 1991 and November 1992 annual performance evaluations[8] demonstrated declining performance *as compared to earlier reports*. The record undisputedly shows that from 1985 through 1989 the veteran received the highest possible marks as to *all* performance categories. The November 1991 report reflects highest marks as to *all but two* categories. The November 1992 report, Mr. Medlin's final performance report in service, reflects highest marks as to *all but three* categories. The veteran argued that these facts show declining performance at the end of his military career and constitute an in-service event necessary for entitlement to service connection or at least entitlement to a VA examination and linkage opinion consistent with VA's duty to assist him in the development of his claim.

The Board addressed the lower marks as to two categories but did not acknowledge the lower mark for the third category. Unlike the Board, the majority here acknowledges that in 1992 the veteran failed to receive highest marks in three performance categories. But the majority then proceeds to determine that the marks received for those three categories are "good," even though the Board never referenced the third category and certainly did not characterize his mark in it as good. *Ante* at 2. To the extent that the Court concluded that any decline in that third category did not reflect a decline in performance, *ante* at 2, 10, the Court erroneously weighed that evidence in the first instance without the Board initially doing so. *See Stinson*, 92 F.4th at 1362.

And to the extent that the majority relies on an assumption that the Board considered Mr. Medlin's lower marks in the third category and implicitly—by not mentioning them—found them

___

[8] His performance evaluations were recorded on Air Force (AF) Form 910, Performance Report. That form requires assessment of seven categories: performance of assigned duties; knowledge of primary duties; compliance with standards; conduct on/off duty; ability to supervise/lead; compliance with individual training requirements; and communication with others.

20

not material, the Court long ago rejected that circular logic. In *Thompson v. Gober*, this Court recognized that, to comply with the Federal Circuit's instruction that we not make factual findings on our own, remand was required for the Board to address material evidence in the first instance. 14 Vet.App. 187, 188-89 (2000) (citing *Hensley v. West*, 212 F.3d 1225, 1263 (Fed. Cir. 2000)). In so doing, the *Thompson* majority rejected the proposition, offered by a dissenting judge in that case, that "[t]he Board's selection of which documents it finds material to discuss is in itself a finding of fact" and that when the Board declines to discuss evidence, it is a factual finding that the evidence "was not of such weight as to warrant discussion" to which this Court should defer. *Id*. at 190-91 (Holdaway, J., dissenting).

The majority tries to resurrect the *Thompson* dissent, requiring us to assume that evidence of a lower mark in a third category wasn't material because, if it was, the Board would have discussed it. But how then would we distinguish between material facts not addressed because they weren't considered at all and material facts not addressed because the Board found them not material? This is left unanswered, both in the majority's decision and in the *Thompson* dissent. This only illuminates the circular impossibility of that reasoning. But, in any event, the majority cannot here, under the auspices of a three-judge panel opinion, flip the holding in *Thompson* to make the dissent our touchstone.

As noted, *supra* at n.2, Air Force performance is based on only seven categories total. The Board recognized that, after 4 years of receiving highest marks in all seven categories, Mr. Medlin in 1991 received lower marks than previously in two (~29%) of the seven categories. It then indicated that a year later, in 1992, Mr. Medlin again received lower marks in two of seven categories. The lower mark in the third category was not mentioned. Absent from the majority opinion is any explanation as to how an additional lower mark in 1992, in three categories instead of two, was immaterial where a central argument on appeal to the Board was the veteran's declining performance. It defies belief that receiving lower marks in three of the seven categories (~43%) instead of two of the seven categories (~29%) could be immaterial to the question of whether the veteran's performance declined.

In addition, although "work performance" is not listed as a category or defined on any of the performance reports, the Board used that undefined phrase in seeming juxtaposition with, and as superior to, the listed performance categories. R. at 11 (Board finds that the fact that Mr. Medlin was found in the last two performance evaluations only to meet military standards in two categories

21

rather than to exemplify them does not reflect a decline in "work performance"). And the majority adopts the same tack, *ante* at 2, 10. Even if "work performance" means the same as "performance of assigned duties," the Board may not assume, without adequate analysis, that a single performance category listed on the report (such as "performance of assigned duties") better represents a service member's performance than other listed performance categories singly or combined. And when the Board does so, as it did in this case, the Court should be clear in rejecting such a significant, and unexplained, assumption if it is material to the case, as it was in this case. Moreover, both the Board and the Court appear to have concluded—without saying so or citing to any authority for such premise—that a decline in a performance category doesn't actually indicate declination unless or until it deteriorates to an objectively substandard quality.

In conclusion, rather than embrace our statutory responsibility to ensure thoughtful and analytical review of the Board's reasons or bases, the majority embraces a rubber stamp approach and encourages the Court to take that approach in the future. I respectfully dissent, both from this short-sighted view of our responsibility and from the Court's affirmance of Mr. Medlin's Board decision.